**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARY NELL WYATT *et. al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 01-1628 (RMU) |
| | : | | |
| v. | : | Document No.: | 67 |
| | : | | |
| SYRIAN ARAB REPUBLIC *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING SYRIA'S MOTION TO DISMISS**

**I. INTRODUCTION**

This case involves the Syrian Arab Republic's alleged support of a terrorist group (the Kurdistan Workers Party or "PKK") that abducted and held certain of the plaintiffs hostage in the early 1990s. The plaintiffs seek damages from the Syrian Arab Republic ("Syria") and the PKK for injuries resulting from the alleged hostage taking. Syria now moves to dismiss the plaintiffs' third amended complaint for failure to state a claim. For the reasons that follow, the court denies Syria's motion to dismiss.

**II. BACKGROUND**

**A. Factual Background**

The plaintiffs allege as follows. On August 30, 1991, two of the plaintiffs, Ronald E. Wyatt and Marvin T. Wilson, were traveling in a van in Turkey when they "were stopped and surrounded by approximately ten vehicles commanded by the PKK."[1] 3d Am. Compl. ¶ 20. The

---

[1] The additional plaintiffs in this case are family members of Wyatt and Wilson. 3d Am. Compl. ¶¶ 4-14. The Wyatt plaintiffs are domiciled in Tennessee, *id*. ¶ 37, and the Wilson plaintiffs are domiciled in Texas, *id*. ¶ 38.

PKK entered the van, removed the plaintiffs at gunpoint, and eventually held Wyatt and Wilson for twenty-one days in eastern Turkey. *Id*. ¶¶ 21-22. The PKK forced Wyatt and Wilson

> to march for up to eleven hours at a time and made [them] live outdoors exposed to the elements without food, shelter, or clothing . . . denied [Wyatt and Wilson] medical care, the ability to communicate with their families or the outside world, subjected [them] to indoctrination and brainwashing attempts and . . . otherwise mistreated [them].

*Id*. ¶ 22.

The PKK and Syria "intended" the hostage-taking to (a) harm Turkish tourism; (b) embarrass the Turkish government; and (c) "utilize Wyatt and Wilson (and the other non-party hostages) as human bait to lure Turkish rescue personnel into ambushes in order to kill them." *Id*. ¶ 23. The PKK placed certain demands and conditions on the release of Wyatt and Wilson; the PKK made these demands and conditions to "outside parties," including governments of the United States, Britain, Australia, and Turkey. *Id*. In particular, the PKK demanded that: (a) the United States terminate its financial and military support of Turkey; (b) the United States, Britain, Australia and Turkey support an independent Kurdish state; (c) the international community recognize the PKK's right to control portions of Turkish territory; and (d) the Turkish government provide increased civil rights to Kurds. *Id*. ¶ 23.

The plaintiffs further allege that

> [a]t all times relevant to this complaint and for at least a decade prior to the abduction of plaintiffs, Syria routinely provided financial, technical, logistical and other material support and resources to the PKK for the express purpose of causing and facilitating the commission of terrorist acts, including acts of extrajudicial killing and hostage-taking.

*Id*. ¶ 28. As examples of this support, the plaintiffs cite Syria's (a) assistance and participation in hostage-taking (including the hostage- taking of Wyatt and Wilson); (b) supply of weapons, ammunition, and false passports to the PKK; (c) establishment and maintenance of the PKK

headquarters and offices in Syria; (d) provision of a safe haven and shelter in Syria to senior PKK commanders; (e) establishment and maintenance of various PKK training and military bases; (f) provision of military and terrorist training to PKK members; and (g) establishment and maintenance of PKK's logistical infrastructure in Syria.  *Id*. ¶ 29.

### B.  Procedural History

The plaintiffs filed their initial complaint in July 2001 and an amended complaint in March 2003.  In February 2004, in light of *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), this court *sua sponte* granted the plaintiffs leave to amend their complaint for a second time "to clarify the jurisdictional basis for suit, the defendants and the capacity in which each defendant is sued, the cause of action for each claim, the relief requested for each claim, and any other matters affected by the intervening precedent."  Mem. Op. (Feb. 23, 2004) at 1-2.  The plaintiffs filed their second amended complaint on March 18, 2004.  In that complaint, the plaintiffs listed as defendants the Syrian Arab Republic, the Syrian Ministry of Defense, Mustafa Tlass (the Syrian Minister of Defense), Ghazi Kanaan (a Syrian military officer), and the PKK.  2d Am. Compl. ¶¶ 15-19.

The defendants (with the exception of the PKK) filed their first motion to dismiss in May 2004.  Believing that the motion attacked the factual basis of the court's subject matter jurisdiction, in September 2004, the plaintiffs moved to compel jurisdictional discovery.  The court granted the plaintiffs' motion in November 2004, and ordered the parties to submit a joint jurisdictional discovery plan.  Syria moved for reconsideration several days later, arguing that the court should avoid discovery because the complaint could be dismissed on grounds that would not subject a foreign sovereign to burdensome discovery.  On December 14, 2004, the court granted Syria's motion for reconsideration, holding that the most appropriate course of

action would be for the parties to complete the chain of briefing on Syria's motion to dismiss prior to any discovery. On January 26, 2005, the plaintiffs filed a notice of voluntary dismissal of their claims against the Syrian Ministry of Defense, Mustafa Tlass, and Ghazi Kanaan. Pls.' Notice of Dismissal at 1. As a result, the only defendants remaining in this case are Syria and the PKK.

On March 3, 2005, the court denied Syria's motion to dismiss on personal jurisdiction grounds; denied without prejudice Syria's motion to dismiss on subject matter jurisdiction grounds; denied without prejudice Syria's motion to dismiss for failure to state a claim; and directed the plaintiffs to amend their complaint for a third time with a statement of which law they seek to apply.[2] *Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 117-18 (D.D.C. 2005). On April 1, 2005, the plaintiffs submitted their third amended complaint, in which they allege claims arising under Tennessee law with respect to the Wyatt family plaintiffs and Texas law with respect to the Wilson family plaintiffs (the states where the families are respectively domiciled). 3d Am. Compl. ¶ 41. In the alternative, the plaintiffs plead these causes of action under the law of the District of Columbia. *Id*. ¶ 42.

Defendant Syria filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the third amended complaint on April 19, 2005 ("Def.'s Mot."). Syria argues that the plaintiffs' claims are time barred under both Texas and Tennessee law, and asserts in the alternative that Turkish law should apply to the plaintiffs' claims. Def.'s Mot. at 1. Syria does not argue for

---

[2] The court also directed the parties, for the second time, to submit a joint plan for conducting discovery on the issue of whether Syria provided material support and resources to the PKK. *Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 117-18 (D.D.C. 2005). With the instant opinion's disposal of Syria's motion to dismiss the third amended complaint, the parties can move forward with jurisdictional discovery. In this regard, the court reminds the parties of its Standing Order ¶ 9, which states in relevant part, "if the court is called upon to resolve a discovery-related motion, it will sanction the losing attorney (not the principal) pursuant to Federal Rule of Procedure 37(a)(4)."

dismissal under Turkish law, but suggests that the court may grant the plaintiffs leave to amend the complaint a fourth time to allege claims under Turkish law. *Id*. The court now turns to Syria's motion.

### III.  ANALYSIS

#### A.  The Court Denies Syria's Motion to Dismiss for Failure to State a Claim

##### 1.  Legal Standard for a Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory." *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.

Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### 2. Statutory Framework

The Foreign Sovereign Immunities Act ("FSIA") is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The basic premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless the action falls under one of the specific exceptions enumerated in the statute. 28 U.S.C. § 1604; *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 196 (D.C. Cir. 2004). If the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over the action. 28 U.S.C. §§ 1330, 1604; *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 42 (D.D.C. 2000) (citing *Amerada Hess*, 488 U.S. at 434-35.

Under the FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)). The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal

determinations. *Foremost-McKesson*, 905 F.2d at 449. The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial. *Id*. (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)).

The exception to foreign sovereign immunity at issue in this case is the state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996). This statute provides that foreign sovereigns are not immune when

> [m]oney damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency [.]

28 U.S.C. § 1605(a)(7).

The statute gives three additional requirements for the exception to apply: (1) the foreign state must be designated as a state sponsor of terrorism at the time the act occurred or was designated as such as a result of such an act; (2) the plaintiff must afford the foreign state a reasonable opportunity to arbitrate the dispute if the act occurred within that state's territory; and (3) either the claimant or the victim must have been a United States national at the time the act occurred. 28 U.S.C. § 1605(a)(7)(A)-(B).

Section 1605(a)(7) does not create a federal cause of action against foreign states, but operates as a "pass-through" statute, granting jurisdiction over these previously immune entities against whom claims may be brought.[3] *Cicippio-Puleo*, 353 F.3d at 1033; *see also Pescatore v.*

---

[3] Although the D.C. Circuit has stated which sources of law *cannot* provide causes of action against a foreign nation in suits brought pursuant to § 1605(a)(7), it has never clarified which sources of law *can* provide causes of action. *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 200 (D.C. Cir. 2004) (declining to rule on the appropriate cause of action in a suit brought pursuant to 28 U.S.C. § 1605(a)(7)); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1134 (D.C.

*Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996) (stating that "[t]he FSIA . . . operates as a 'pass-through' to state law principles"). Section 1606 of the FSIA provides the standard of liability for claims for relief brought against foreign states:

> [a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances [.]

28 U.S.C. § 1606.

### 3. Texas and Tennessee Law Govern the Plaintiffs' Claims

#### a. Forum State Choice-of-Law Principles Apply

In a FSIA case such as this, District of Columbia choice-of-law rules apply to issues governed by state law. *Virtual Dev. and Def., Int'l, Inc. v. The Republic of Moldova*, 133 F. Supp. 2d 9, 15 (D.D.C. 2001) (holding that the goal expressed in § 1606 "of applying identical substantive laws to foreign states and private individuals cannot be achieved . . . unless a federal court utilizes the same choice-of-law analysis in FSIA cases as it would if all the parties of the action were private").[4]

---

Cir. 2004). The D.C. Circuit has now made clear that federal common law and generic formulations of common law cannot furnish a cause of action. *Acree v. Republic of Iraq*, 370 F.3d 41, 55 (D.C. Cir. 2004).

[4] Other courts have applied federal common law choice-of-law rules for issues governed by state law under the FSIA on the grounds that the FSIA does not include an explicit choice-of-law provision. *See Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987) (stating that "[i]n the absence of specific statutory guidance, we prefer to resort to the federal common law for a choice-of-law rule"). Although the FSIA does not include a specific choice-of-law provision, it is not true that it provides no statutory guidance. Section 1606 directs this court, in the context of actions brought under § 1605(a)(7), to "allow plaintiffs to bring any claims they would be able to bring if the defendant were a private individual charged with the same acts of terror." *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at * 11 (D.D.C. 2005); *see also Foreign Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) (stating that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances").

   The absence of a specific choice-of-law provision requires the court to infer the choice-of-law analysis that will best effectuate congressional intent from the statutory language. *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 961 (2nd Cir. 1991) (stating that "the fact that we are not compelled to apply state choice-of-law principles in this federal question

### b. Legal Standard For District of Columbia Choice-of-Law Analysis

As a threshold inquiry, District of Columbia choice of law analysis requires a determination of whether a "true conflict" exists. *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). The true conflict test asks whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdiction is different. *See id*.

> A false conflict exists when either (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its laws and the policies of the states whose laws are claimed to be in conflict would not be advanced by application of their law.

*Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995); *accord Biscoe v. Arlington County*, 738 F.2d 1352, 1360 (D.C. Cir. 1984).

If a true conflict exists, the court follows the District of Columbia's choice-of-law principles, which utilize a "constructive blending" of two distinct analyses; the "governmental interests" analysis and the "most significant relationship" test. *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989); *see also, Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 194 (D.C. Cir. 1999); *Virtual Dev.*, 133 F. Supp. 2d at 15. "Under the governmental interests analysis as so refined, we must evaluate the governmental policies

---

case does not preclude us from relying on state law if we believe that doing so would best effectuate Congress' overall intent"). Furthermore, the Supreme Court has advised that "cases in which judicial creation of a special federal rule would be justified" are "few and restricted" and "are limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 87 (quotation marks omitted). For these reasons, the court prefers to apply the choice-of-law principles of the District of Columbia to issues governed by state substantive law as the best effectuation of congressional intent and as an alternative to the unbounded discretion that judicial creation of an alternative rule would imply. *See generally* Joel Mendal Overton, II, *Will the Real FSIA Choice-Of-Law Rule Please Stand Up?*, 49 WASH. & LEE L. REV. 1591, 1602 (1992) (concluding that "[w]ith the exception of cases brought under the court's diversity jurisdiction, under which a clear choice-of-law rule exists, and cases brought pursuant to a particular statutorily granted cause of action containing its own choice-of-law provision, courts appear to be free to pick and choose whatever choice-of-law rules justice may require").

underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co.*, 566 A.2d at 40. In determining which jurisdiction has the most significant relationship to the dispute, there are four relevant factors under the Restatement: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971); *Hercules*, 566 A.2d at 42 (adopting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145). Section 145 also references § 6 of the Restatement for the courts to consider:

> [w]hen there is no [state statutory directive on choice-of-law,] the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971); *Dunkwu v. Neville*, 575 A.2d 293, 296 (D.C. 1990) (adopting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971)).

### c. The District of Columbia's Choice-of-Law Analysis Requires Application of Texas and Tennessee Law

There are three possible sources of law mentioned by the parties in this case: (1) the law of the domicile states of the respective plaintiffs (Texas and Tennessee), (2) the law of the forum state (the District of Columbia), and (3) the law of the foreign state where the alleged

injuries occurred (Turkey).[5]  Syria addresses the choice of law analysis with a flat and analytically empty assertion that Turkish law "would be the correct choice-of-law for any tort claims that may exist along the lines alleged by the plaintiffs." Def.'s Mot. at 1.  The court previously directed Syria that any further Rule 12(b)(6) motions to dismiss must be restricted to addressing the issue of what law should apply to this action, including considering arguments previously made by the plaintiffs in support of the application of D.C. law.  *Wyatt*, 362 F. Supp. 2d at 117.  In addition to ignoring this direction of the court, Syria has shown no way in which Turkish law and the law of the District of Columbia, Texas, or Tennessee differ or would lead to disparate results in this case.  Rather, both parties have recognized that Turkish law likely provides viable causes of action for the injuries alleged in this suit.  Def.'s Mot. at 1; 3d Am. Compl. ¶ 42 n.2.  As a result, the court is aware of no reason why the law of Turkey, as compared to the law of the states on which the plaintiffs base their causes of action, would

---

[5] Although the law of Syria, the foreign state where material support of the PKK allegedly occurred, is also a conceivable source of law in this case, the court rejects this choice.  It is implausible to conclude that Congress would have passed § 1605(a)(7) to grant jurisdiction to federal courts over foreign states that the United States Department of State has determined to be state sponsors of terrorism, only to require application of the law of such states (to the extent such states can be said to have law).  *See* H.R. Rep. No. 104-383, at 62 (1995) (stating that "[t]hese outlaw states consider terrorism a legitimate instrument of achieving their foreign policy goals. They have become better at hiding their material support for their surrogates, which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like").

produce different results when applied to the facts at issue.[6]  Accordingly, the law of the United

---

[6] Although the court holds that Syria has effectively waived arguments that a true conflict between Turkish and D.C., Texas, and Tennessee law exists, the court would likely have reached the same conclusion and refused to apply Turkish law had Syria attempted the arguments it was directed to consider.  Texas, Tennessee, and the District of Columbia are each part of a larger jurisdiction – the United States – and share its interests in an internationally-oriented choice-of-law analysis such as this. *See Alvarez-Machain v. United States*, 331 F.3d 604, 635 (9th Cir. 2003) (conducting a choice-of-law analysis under the FSIA by first balancing the relevant contacts and interests as between the United States and Mexico, and after finding the United States' interests more weighty, conducting a choice-of-law analysis as between the federal common law and the law of California).

While Turkey clearly has some degree of interest in adjudication of this matter because the hostage-taking occurred within its borders by a group seeking to create an independent Kurdish state within Turkish territory, 3d Am. Compl. ¶ 23, the complicated factual nature of this case points in several respects away from Turkish contacts and interests.  Though the actual abduction took place in Turkey, the plaintiffs also seek recovery for injuries suffered by the family members of Wyatt and Wilson, including emotional distress and damages for consortium and solatium as a result of their kidnaping, injuries which the plaintiffs suffered while in the United States.  *See generally* 3d Am. Compl. ¶¶ 51-53, 60-63.  The plaintiffs allege that Syria provided material support and the means to carry out such acts in Syria, not in Turkey.  *Id*. ¶ 29.  Finally, Wyatt and Wilson are United States citizens, and their hostage-taking was allegedly meant to force numerous actions by the United States government, including the end to all military and financial support of Turkey.  *Id*. ¶ 23.

D.C.'s constructive blending approach requires that the court consider the § 6 factors of the Restatement, the most important of which in tort actions is (c), "the relevant policies of the forum and of other interested states and the relative interests of those states in the determination of the particular issues."  *Long*, 877 F. Supp. at 11 (quoting RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6(2) (1971)).  The state-sponsored terrorism exception embodied in § 1605(a)(7) is "designed to influence the sovereign conduct of foreign states," *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 14 (D.D.C. 1998), and meant to "give American citizens an important economic and financial weapon against . . . outlaw states."  H.R. Rep. No. 104-383, at 62.  This expressed interest also extends to families who suffer injuries as a result of terrorist acts committed against a member of that family.  *Id*. (stating that "the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted").

In furtherance of these goals, the United States has a unique interest in applying its own law, rather than the unfamiliar law of a foreign nation (let alone the "law" of a rogue terrorist nation such as Syria), to determine liability involved in a state-sponsored terrorist attack on one of its citizens, particularly when such an attack is directed against its national interests.  *Dammarell*, 2005 WL 756090 at * 20 (noting that "the United States has an interest in projecting its laws overseas for 'certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests'") (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(3) (1987)).  These unique interests are not always involved in § 1605 cases, and cannot always justify application of United States law over the law of a foreign jurisdiction.  *See, e.g.*, *Harris*, 820 F.2d at 1003-4 (utilizing federal common law choice-of-law principles to apply Polish law in a case brought under § 1605(a)(2)); *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 756 F. Supp. 136, 141-42 (S.D.N.Y. 1991) (utilizing New York's choice-of-law rules to apply Bolivian law in a case brought under § 1605(a)(2)).  Under the facts of this case, however, they weigh in favor of applying the law of a forum within the United States.

States forum, rather than the law of Turkey or Syria, will apply to the plaintiff's claims.

The plaintiffs assert that if the court chooses not to apply Texas and Tennessee law, D.C. law should apply. 3d Am. Compl. ¶ 42 n.2. The choice between the law of the District of Columbia and the plaintiffs' respective states of domicile presents a "false conflict" under D.C.'s choice-of-law analysis, because, in addition to the lack of any apparent substantial differences between the personal injury laws of these fora, no policy of D.C. would be advanced by the application of its law in this case. The plaintiffs are not residents of the District of Columbia and, outside of this action, they have no particular connection to the District of Columbia. Although uniformity and predictability are relevant factors under the Restatement, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971), the FSIA does not itself mandate uniformity of substantive law that might tip the balance in favor of selecting D.C. law as the exclusive source of law for § 1605(a)(7) actions. *See Dammarell*, 2005 WL 756090, at * 19 (stating that "[t]he only plausible rationale for choosing the law of the District of Columbia in an FSIA case is to adopt a single, familiar rule of decision in the interest of developing a uniform and easy to apply set of legal standards"). Additionally, the D.C. Circuit has cast significant doubt on how far policy concerns for uniformity may go to justify the selection of a source of law for § 1605(a)(7) actions. *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004) (holding that neither § 1605(a)(7) nor the Flatow Amendment create a federal cause of action against a foreign state); *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004) (holding that "generic common law cannot be the source of a federal cause of action" against a foreign state) (emphasis in original). In a recent case, a court has concluded that the plain text of § 1606 cannot be overcome by the unique concerns and interests, including interests in uniformity, that § 1605(a)(7) cases typically involve. *Dammarell*, 2005 WL

756090, at * 11 (rejecting the argument that interests in uniformity can justify creating federal common law under the FSIA, and noting that "[t]his is not to say that a court should be insensitive to the unique concerns raised by an action alleging that a foreign country is a sponsor of terrorism. These concerns simply cannot overcome the plain text of the statute, which directs the courts to allow plaintiffs to bring any claims they would be able to bring if the defendant were a private individual charged with the same acts of terror"). The D.C. Circuit has also applied similar reasoning to argue that the FSIA does not grant authority to create a complete body of federal law because § 1606 "in effect instructs federal judges to find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).

In addition, interests in uniformity by themselves are insufficient, without an explicit statutory directive and in the absence of a significant conflict between a federal policy and state law, to "justify displacing state law in favor of a federal common law rule." *B.F. Goodrich v. Betkoski*, 112 F.3d 88, 91 (2d Cir. 1997); *see also Mims v. Mims*, 635 A.2d 320, 324-25 (D.C. 1993) (holding that interests in uniformity are not determinative in a choice-of-law analysis when another jurisdiction has "a significantly greater interest" in adjudication of the matter). For the foregoing reasons, the application of the law of the District of Columbia, like the uniform application of federal common law, cannot be justified under § 1605(a)(7) on the grounds of an interest in uniformity.

The United States jurisdictions with the most significant interests in this action are therefore the respective states of domicile of the plaintiffs. Accordingly, Tennessee law will govern with respect to Wyatt plaintiffs' claims, and Texas law will govern with respect to the

Wilson plaintiffs' claims. The court therefore proceeds to consider Syria's arguments concerning the application of Texas and Tennessee law.

### 4. The Plaintiffs' Claims are Not Barred by State Statutes of Limitations

Syria argues that the plaintiffs' personal injury claims are barred under the Texas and Tennessee statutes of limitations, and that § 1605(a)(7)'s own statute of limitations, contained in § 1605(f),[7] does not preempt this result.[8] Syria argues that in light of *Cicippio-Puleo v. Islamic Republic of Iran*, § 1605(a)(7) is "purely a jurisdictional provision," and that § 1605(f) establishes only a "jurisdictional period" during which claims against foreign states may be brought. *Id*. at 2. Syria argues that the intention underlying § 1605(f) was not to preempt the application of state statutes of limitations, "if Congress has such power in the absence of a federal cause of action," because § 1605(a)(7) is a jurisdictional provision that applies only to the subject matter jurisdiction of federal district courts. Def.'s Mot. at 4. Syria asserts that the plaintiffs' claims, which arose during August and September of 1991, are barred because they

---

[7] The court rejects the plaintiffs' argument that Syria has waived the statute of limitations defense by not raising it in earlier motions. Opp'n at 2. Under Federal Rule of Civil Procedure 12(g), if a defendant fails to raise certain defenses when making a motion to dismiss, those defenses are forfeited. *See Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) (stating that "an affirmative defense is forfeited if it is not raised in the answer"); *See* FED. R. CIV. P. 12(g). The D.C. Circuit, however, has made it clear that a defense of limitations that is filed before an answer is most appropriately treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *Gordon v. Nat'l. Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982); *Daingerfield Island Protective Soc'y v. Lujan*, 797 F. Supp. 25, 29 (D.D.C. 1992). A defense of failure to state a claim can never be waived. FED. R. CIV. P. 12(h)(2). Accordingly, Rule 12(g) does not bar Syria from raising its statute of limitations arguments in this motion to dismiss the third amended complaint.

[8] 28 U.S.C. § 1605(f) provides that: "No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period."

were brought five years after § 1605(a)(7) became effective, well after the limitations periods under Texas and Tennessee law had both run.[9]

For the following reasons, the court rules that § 1605(f) preempts state statutes of limitations that would normally govern state claims, and that the plaintiffs' claims are therefore not time-barred.

### a. Section 1605(f) Preempts State Statutes of Limitations

#### 1. Legal Standard for Federal Preemption

The preemption doctrine is rooted in the Supremacy Clause of Article VI of the Constitution and stands for the general proposition that courts implement Congress' intent for a federal law to trump, and therefore supersede, the enforceability of a state law. *Fidelity Fed. Sav. & Loan Assoc. v. De La Cuesta*, 458 US 141, 152-153 (1982); *see* U.S. CONST., ART. VI, CL. 2. Application of the preemption doctrine requires the court to examine congressional intent, whether it be express or implied. *Id.* at 152-153. In general, to determine whether a federal statute or regulation preempts state law, the court must evaluate: (1) the congressional intent to occupy the entire field and whether the pervasiveness of the regulatory scheme leaves no room for state supplementation; (2) the level of dominance of the federal interest in preventing state intervention; and (3) the danger of conflict between state laws and the administration of a federal program. *Commonwealth of Pa. v. Nelson*, 350 U.S. 497, 502-05 (1956). "Accordingly, the purpose of Congress is the ultimate touchstone in the preemption

---

[9] Section 1605(f) states in relevant part that "[a]ll principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitations period." 28 U.S.C. § 1605(f). Syria argues that this sentence should be read as tolling a state statute of limitations period until at least April 24, 1996, when 1605(a)(7) became effective, and before which all foreign states were immune from suit. Def.'s Mot. at 3. After this date, in the absence of other causes for equitable tolling, Syria argues that the state's statute of limitations should control the timeliness of a cause of action brought under its laws. *Id*. Tennessee law imposes a one-year limitation on personal injury claims, TENN. CODE ANN. § 28-3-104 (2004); Texas law imposes a two-year limitation. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (2004).

analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted) (quoting *Malone v. White Motor Corp.*, 331 U.S. 497, 504 (1978)).

### 2. Section 1605(f) Preempts State Statutes of Limitations

The United States, like foreign states, is immune from suit except for specific instances when Congress has waived immunity. *Compare United States v. Shaw*, 309 U.S. 495, 500-501 (1940) (holding that "without specific statutory consent, no suit may be brought against the United States") *with Amerada Hess*, 488 U.S. at 434 (holding that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts"); *see also* 28 U.S.C. § 1604 (stating that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter").

By way of analogy, the court looks to the Federal Tort Claims Act ("FTCA"). The FTCA's two-year limitations period is a substantive part of the United States' waiver of immunity which preempts any applicable state limitations period.[10] *See, e.g., United States v. Kubrick*, 444 U.S. 111, 117 (1979) (describing the FTCA's statute of limitations as "a condition of that waiver"); *Poindexter v. United States*, 647 F.2d 34, 36 (9th Cir. 1981). Courts have described the FTCA's limitations period as "jurisdictional" in the following unique sense:

> [g]enerally speaking the time requirement prescribed by a statute granting the right to sue the United States or a state is construed as *a condition or qualification of the right*; such a provision is in other words jurisdictional rather than a mere statute of limitations.

*Simon v. United States*, 244 F.2d 703, 705 (5th Cir. 1957) (emphasis added) (quoting 34 AM. JUR. *Limitation on Actions* § 7 (1956)).

---

[10] The FTCA includes the following statute of limitations: "[a] tort claim against the United States shall forever be barred unless action is begun within two years after such claim accrues . . ." 28 U.S.C. § 2401(b).

The court interprets § 1605(f) to have the same preemptive effect on state statute of limitations periods as the FTCA's statute of limitations. Although state law will generally provide the rules of decision for FSIA cases (like FTCA cases), jurisdiction of federal district courts to hear such cases is based in federal question jurisdiction rather than diversity jurisdiction. *Schoenberg v. Exportadora de Sal*, 930 F.2d 777, 782 (9th Cir. 1991); *Barkanic*, 923 F.2d at 961. It follows, therefore, that while Congress may choose to waive a foreign state's immunity and allow causes of action to be brought against it "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it is not therefore stripped of its authority to require its own statute of limitations to apply in cases against foreign states as a *condition* of that waiver. Congress, which alone has the right to determine when courts may exert jurisdiction over foreign states, must necessarily have the power to determine when such actions must be commenced.[11]

Furthermore, Syria's construction of § 1605(f) is implausible and only follows from attributing an absurd intent to the drafters of the FSIA. If § 1605(f) were intended to merely create a jurisdictional "window" during which claims against foreign states could be brought in federal court, the ten-year period, which extends much farther than the average state limitations period for personal injury claims, would be totally unnecessary. Under such a construction, Congress would only have needed to pass the second sentence of § 1605(f), which tolls the limitations period until such time when the foreign state is no longer immune from suit. 28

---

[11] *Cf. Young v. United States*, 184 F.2d 587, 590 (D.C. Cir. 1950) (holding that the FTCA's statute of limitations preempts state statutes of limitations that would normally govern the state claims involved, and stating, "[i]t is our view that in adopting in general the local statute Congress in particular did not adopt the local period of limitation, that Congress extended the time in cases involving the United States, and that the situation is as if Congress reenacted the local statute in its principal substantive provisions but gave each right of action a longer life where a claimant seeks to hold the United States responsible").

U.S.C. § 1605(f). If the purpose of § 1605(f) were merely to ensure that a state cause of action could be brought pursuant to the state's own statute of limitations starting on the date the foreign state is no longer immune from suit, forbidding such an action from commencing not later than 10 years after that date is effectively an empty provision. Under Syria's construction, the only conceivable intention behind the ten-year limitation period would be to *prevent* persons in states with limitation periods longer than ten years from bringing claims more than ten years after the foreign state was divested of immunity. It is plainly untenable to ascribe such an intention to Congress in an Act expressly purposed to "give American citizens an important economic and financial weapon against . . . outlaw states." H.R. Rep. No. 104-383, at 62.

Finally, the statute is notably devoid of any qualifying language that might imply that it was not meant to preempt state limitations periods. Syria helps prove this point by directing the court to 28 U.S.C. § 1658, a provision of federal law which contains a limitations period on the commencement of civil actions arising under acts of Congress passed after December 1, 1991. Section 1658 states: "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [December 1, 1991] may not be commenced later than 4 years after the cause of action accrues." Accordingly, § 1658 applies to all federal acts passed after December 1, 1991, except "those claims with respect to which another statute provides a different limitations period." *Zubi v. AT&T Corp.*, 219 F.3d 220, 226 (3d Cir. 2000). Conspicuously absent from § 1605(f) is similar qualifying language.[12]

---

[12] Section 1658 was passed in part to "address the 'frequently present problem of a conflict of laws in determining which State statute [was] controlling, the law of the forum or that of the situs of the injury.'" *Jones v. R. R. Donnelly & Sons Co.*, 541 U.S. 369, 378 (2004) (internal citations omitted). In particular, problems of uniformity arose under statutes such as 42 U.S.C. § 1981, a federal statute which provides causes of action, but contains no statute of limitations. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) (holding that federal courts should apply "the most appropriate or analogous state statute of limitations" to claims brought under § 1981). Problems of interpretation have centered on whether later amendments that alter and/or enlarge federal statutory causes of action enacted prior to December 1, 1991 constitute civil actions "arising under an Act of Congress enacted after [December 1,

Section 1605(f) is a statute of limitations that preempts other statutes of limitations applicable to the particular source of law from which a plaintiff may derive causes of action in § 1605(a)(7) cases. Under the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived. The plaintiffs brought this action in July 2001, roughly five years before the limitations period on their claims would have run. Accordingly, the plaintiffs' claims are not time-barred.

## IV. CONCLUSION

For all the foregoing reasons, the court denies Syria's motion to dismiss for failure to state a claim, and orders the parties to submit a joint plan for conducting discovery on the issue of whether Syria provided material support to the PKK within 60 days of the issuance of this opinion. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 30th day of September, 2005.

RICARDO M. URBINA<br>
United States District Judge

---

1991] [.]" 28 U.S.C. § 1658; *R. R. Donnelly*, 541 U.S. at 380 (resolving this problem and holding that "[a]n amendment to an existing statute is no less an 'Act of Congress' than a new, stand-alone statute"). Section 1605(f) suffers from no similar statutory ambiguity that might be resolved in favor of applying a state's statute of limitations instead of § 1605(f)'s ten-year period. On the contrary, Congress included an express statute of limitations, and chose to make § 1605(a)(7) retroactive with respect to all claims that could be brought against foreign states by tolling the limitations period during all periods where a state was immune from such suits, which includes all periods prior to the enactment of § 1605(a)(7).